**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS,**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHERYL HURD, M.D.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **(1) TARRANT COUNTY HOSPITAL** | § | **CIVIL ACTION NO. _____** |
| **DISTRICT d/b/a JPS HEALTH** | § | |
| **NETWORK AND JOHN PETER SMITH** | § | |
| **HOSPITAL; and** | § | |
| **(2) ACCLAIM PHYSICIAN GROUP, INC** | § | |
| | § | |
| **Defendant.** | § | |

**<u>PLAINTIFF'S ORIGINAL COMPLAINT</u>**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff Cheryl Hurd, M.D. ("Plaintiff") files her Original Complaint in the above-referenced cause of action, complaining of Defendant Tarrant County Hospital District d/b/a JPS Health Network and John Peter Smith Hospital, and Defendant Acclaim Physician Group, Inc. ("Defendants" or "JPS"), and would respectfully show the Court as follows:

## I.      INITIAL STATEMENT

1.1      Plaintiff is a highly skilled, highly credentialed psychiatrist who has devoted over eighteen years to her patients and her students.  To Plaintiff, teaching and mentoring is an essential part of who she is.  She feels a calling, duty and responsibility to ensure that future mental health professionals are properly situated to have impactful careers to address the growing mental health crises that face Americans and, in particular, those in the local community of Tarrant County.

1.2      Despite dutiful service and professional accolades, after more than 13 years of service at JPS as a clinician, educator, administrator and facilitator, Plaintiff's career was

demolished when she was summarily demoted from all Psychiatry Department leadership and administrative positions on Friday, March 18, 2022.  This occurred one hour before this year's medical student and training program "Match Day" results were publicly released in what appears to be a calculated, malicious, vindictive manner.  She was not given any warning or indication that this would happen, nor that her professional performance had been unsatisfactory in any way.  This was done without due process and it was done in a manner injurious of her personal and professional reputation.  This suit results.

## II.    PARTIES

2.1     Plaintiff Cheryl Hurd is a citizen of the United States and a resident of the Northern District of Texas.

2.2     Defendant Tarrant County Hospital District d/b/a JPS Health Network is registered under the laws of the State of Texas and maintains its principal place of business in Fort Worth, Texas.  It may be served with process through Karen Duncan, its President, at 1500 South Main Street, Fort Worth, Texas 76104, through its legal department at 1500 South Main Street, Fort Worth, Texas 76104, or alternatively through the Tarrant County District Attorney's Office at 401 W. Belknap Street, Fort Worth, Texas 76196.

2.3     Defendant Acclaim Physician Group, Inc. is a non-profit corporation registered under the laws of the State of Texas and maintains its principal place of business in Fort Worth, Texas.  It may be served with process through its registered agent, Mr. Robert Earley at 1500 South Main Street, Fort Worth, Texas 76104.

2.4     Defendant Acclaim Physician Group, Inc. operated as the entity responsible for supplying all physicians to Defendant Tarrant County Hospital District.  Defendant Tarrant County Hospital District is a member of Defendant Acclaim Physician Group, Inc..  Defendant Tarrant

2

County Hospital District utilizes the services of Defendant Acclaim Physician Group, Inc..  For purposes of this lawsuit, the Defendants are either one, combined de facto entity or are alleged to have acted jointly and conspired with one another.  Defendant Acclaim Physician Group, Inc. is alleged to have aided and abetted Defendant Tarrant County Hospital District, a state actor.

2.5     Defendant Tarrant County Hospital District and Defendant Acclaim Physician Group, Inc. shall be jointly referred to as "Defendants" or "JPS."

## III.     JURISDICTION AND VENUE

3.1     This Court has jurisdiction of this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3).  As more fully appears herein, Plaintiff brings this action pursuant to 42 U.S.C. §1983 and seeks to vindicate rights guaranteed to her by the Constitution of the United States, as it is a suit to redress the violation of the Plaintiff's constitutional rights to procedural and substantive due process of law.

3.2     Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division.

## IV.     CONDITIONS PRECEDENT

4.1     All conditions precedent to the institution of this action have been performed or have occurred.

## V.     FACTUAL BACKGROUND

5.1     Plaintiff obtained a Bachelor's Degree followed by a Master's Degree in English Literature from Southern Methodist University.  Meanwhile, her husband, Howard Hurd III, was accepted into medical school at the University of Texas School of Medicine at Houston. In order to provide support for her husband during his first year of medical school, she requested and was granted a one-year enrollment deferral at the University of Texas at Austin School of Law. During

that year, Plaintiff attended a few medical school classes with her husband where she discovered a whole new world and another method to directly improve the lives of her fellow man. Plaintiff decided to change her life course and graduated from the Texas A&M University School of Medicine in 1998. She was uncertain whether to pursue a specialty which addresses a patient's physical needs or their mental health needs. As a result, she pursued training in a combined Internal Medicine-Psychiatry Residency in Phoenix, Arizona.

5.2    Upon completion of her clinical residency training, Plaintiff and her family returned home to Texas.  Faced with a myriad of options, Plaintiff elected to open a small solo practice in Brownwood, Texas where she would be the sole provider of psychiatric specialty services for multiple counties in the Central Texas area because she believed providing these critical resources to an underserved community was essential. This required personal and professional sacrifice, exemplified by twenty-four hour call coverage for her years of practice.

5.3    It was during her five years in solo practice that she was approached by Alan Podawiltz, M.D. ("Dr. Podawiltz") about becoming the Psychiatric Consult-Liaison Physician at JPS in Fort Worth, Texas. Thus, she was presented with the opportunity to help provide Psychiatric and mental health services to the indigent and low-income population of Tarrant County.  Again, Plaintiff felt called to serve.

5.4    Plaintiff began her career with JPS in August 2008.  Plaintiff's job responsibilities consisted of providing Psychiatric consultation services to the inpatients at JPS who were being treated for medical and surgical conditions. When Plaintiff began work as the Consult-Liaison Psychiatrist, she and a Psychiatry resident were responsible for providing psychiatric evaluation, treatment recommendations and follow-up care to JPS inpatients requiring mental health services during an acute medical or surgical illness. During her tenure and due to her dual training and

board certifications in both Psychiatry and Internal Medicine, Plaintiff was responsible for the development and implementation of a dedicated "Med-Psych" Unit where patients with co-existing acute psychiatric illness and unstable medical conditions could receive treatment. Typically, patients must wait for their medical conditions to stabilize enough so that they can be transferred to the inpatient Psychiatric Unit for mental health care services. The "Med-Psych" Unit allowed the simultaneous treatment of both acute psychiatric and medical illnesses. Over time, the Med-Psych Unit and its responsibilities grew into an invaluable aspect of patient care at JPS, such that it was a stand-alone, full-staffed and resourced component of JPS.

5.5     In 2011, Plaintiff applied for and was selected to take on the role of the Psychiatry Clerkship Director for the medical students at the University of North Texas Health Science Center Texas College of Osteopathic Medicine – an affiliate of JPS. JPS was in charge of placing its personnel in the position of Psychiatry Clerkship Director. Plaintiff relished this opportunity to both interact and mentor budding professionals in the psychiatry field. Doing so would help them and benefit countless patient lives.

5.6     The standard in place, at that time, required Plaintiff to undergo a 90-day probationary period as the Psychiatry Clerkship Director. Plaintiff was so immediately successful in her dedication and performance in the role that the probationary status was removed after only one month and she was officially appointed to the position of Psychiatry Clerkship Director by Dr. Podawiltz, the Chair of the JPS Psychiatry Department.

5.7     During her years as the Psychiatry Clerkship Director, Plaintiff was responsible for the development and administration of the educational program for the third-year and fourth-year medical students as they rotated through their Psychiatric Medicine requirements and electives. This included didactic lectures and clinical experience, as well as direct patient care. Plaintiff

greatly enjoyed her direct involvement in the administrative side of academic medicine and sought to expand her experiences.

5.8     Plaintiff was approached and asked by JPS officials to take on the role of Associate Psychiatry Residency Program Director in 2014, while still performing her clinical duties as the Psychiatry Consult-Liaison Physician and serving as the Psychiatry Clerkship Director. While performing all of these roles, the Psychiatry Residency Program Director retired suddenly due to a contractual reorganization between JPS and the University of North Texas Health Science Center Texas School of Osteopathic Medicine. Therefore, in September 2016, Plaintiff was named the Interim Psychiatry Residency Program Director by Dr. Podawiltz.

5.9     Plaintiff participated in JPS's national search for the position of the Psychiatry Residency Program Director.  Plaintiff was selected as the official Psychiatry Residency Program Director in January 2017. She served as both the Psychiatry Clerkship Director and the Psychiatry Residency Program Director through 2017 and most of 2018 while maintaining nearly full-time clinical duties.

5.10     Plaintiff's clinical load was required by the Psychiatry Department Chairman in spite of a protocol from the American Council on Graduate Medical Education ("ACGME"), the accrediting body who oversees physician residency training in all specialties.  The ACGME requires that Psychiatry Residency Program Directors be provided with 0.5 Full-Time Equivalent hours (20 hours per week) of protected time to meet the duties of the director position because of the associated demands. Being committed to her role as the Psychiatry Clerkship Director and Psychiatry Residency Program Director, Plaintiff simply elected to attend to her administrative duties in these two roles "after hours" and on her own time.  Plaintiff felt that doing right by patients, JPS, and her students was her true reward.

5.11   Placement of medical students into a residency program is a unique and complicated process.  During their fourth year of medical school, medical students interview at various programs in their preferred specialty. Once interviews are completed nationwide, the medical students and the training programs both rank their choices in programs and applicants, respectively. A computer algorithm matches the medical students and programs to provide everyone with their highest possible match. Each year, on a specified day in March, the students are informed of where they will be completing their resident physician training. This day is referred to as "Match Day" and is arguably a more important and special day than actual graduation from medical school. All students who did not "match" and all programs who did not fill all of their training positions are notified the day prior to Match Day.  Both sides then quickly work through direct contact with one another in an attempt to fill all available training positions and provide training opportunities for all graduating medical students.

5.12   Before Plaintiff assumed the role of Psychiatry Residency Program Director, the JPS Psychiatry Residency Program had to use this last-minute direct contact procedure with "unmatched" medical students the day before the "match" announcement to fill all of its available positions. That changed under Plaintiff's guidance and leadership of the Psychiatry Residency Program.  During the Plaintiff's tenure as Director of the JPS Psychiatry Residency Program, the program has yet to move into the lower half of its ranking list of applicants and typically fills all available positions from the top third of their ranking list.  In fact, during one year's match process, while Plaintiff was the Program Director, the Psychiatry Residency Program filled its six available training positions with the first six students on the program's ranking list. Additionally, during Plaintiff's tenure as Director, the JPS Psychiatry Residency Program expanded from six to eight Psychiatry residents in each year of training. Under Plaintiff's guidance as Program Director,

graduates from the JPS Psychiatry Residency Program have proceeded on to further sub-specialty Psychiatric training at institutions such as Stanford, Yale and Johns Hopkins.

5.13    All of Plaintiff's incredible and impactful work was recognized by those in JPS's leadership.  In 2020, Plaintiff was appointed by Alan Podawiltz, M.D. to serve as the Vice Chair of Education in the JPS Psychiatry Department.

5.14    The same was true of Plaintiff's peers on JPS's medical staff.  Plaintiff was elected by the physicians in all specialties at the JPS Health Network to serve as the Vice-President of Medical Staff for 2018 and 2019 and, subsequently, was elected as Medical Staff President (Chief of Staff) of JPS for 2020 and 2021. She served for three years as the Vice-Chair of the Physician Board of Directors for JPS's Acclaim Physician Group (the JPS physician group formed when the University of North Texas Health Science Center Texas College of Osteopathic Medicine decided to no longer retain the physician staff at JPS as employees).

5.15    Plaintiff is likewise respected and recognized outside of JPS for her professional qualifications, expertise and ethics.  Plaintiff is an appointed Associate Adjunct Professor with the University of North Texas Health Science Center Texas College of Osteopathic Medicine.  She is also a professor at the Texas Christian University School of Medicine.

5.16    Plaintiff is a major believer in professional standards and accountability.  She has served on the JPS Health Network Practitioner Advisory Council, which is responsible for evaluation and management of disruptive physician behavior, and is actually the current Chair of this committee through the end of 2023.  Since 2016, Plaintiff has served as the Co-Chair of the Acclaim Physician Group Compliance Committee which is responsible for development and administration of the Code of Conduct for the Acclaim Physician Group.  Plaintiff was appointed, in 2021, to be JPS's Chair of the Graduate Medical Education Subcommittee on Diversity, Equity

and Inclusion.  Plaintiff has also served on the JPS Health Network Ethics Committee since 2016. In total, Plaintiff has been appointed to or elected to roughly two dozen committees during her time at JPS.

5.17    Plaintiff has been honored with multiple, specific awards during her time at JPS including, among others, the University of North Texas Health Science Center President's Award for Educational Excellence, the JPS Graduate Medical Education W. W. Goldman, Jr. Memorial Award for Outstanding Clinical Professor, the Psychiatry Department Physician of the Year Award, the Psychiatry Department Outstanding Faculty Educator Award and the Psychiatry Department Excellence in Psychiatric Education Award.

5.18    On December 8, 2021, Plaintiff had a scheduled, monthly Zoom meeting with two of the advanced practitioners for whom she provides support in her role as Fellowship Director. Following the conclusion of business, Plaintiff was checking on the current events in the personal lives of the attendees.  This is a habitual, fundamental supervisory practice, as the well-being and mental health of the psychiatrist and psychologist is under constant stress and associated monitoring because of the difficulties of the job.   In fact, psychiatrists and psychologists, themselves, are professionally encouraged to regularly seek help and evaluate their own personal mental health.  There is well-known stress and trauma that is a byproduct of their jobs.

5.19    During this December discussion, one practitioner relayed to Plaintiff that she was involved in a contentious divorce proceeding in the Johnson County courts.  The practitioner was dating an African-American, and it was Plaintiff's impression that the court officials have a tendency to conduct their affairs in what could be perceived as a racially insensitive manner (based on Plaintiff's personal experience with the courts). Plaintiff advised the practitioner to proceed with caution and care, effectively trying to warn and protect the practitioner against any potentially

biased behavior by the courts.  The practitioner agreed and indicated that she would proceed cautiously and expressed appreciation for Plaintiff's concern.  There were three individuals present in that Zoom meeting, including Plaintiff.

5.20    On December 30, 2021, Plaintiff was contacted by Teresa Morgan from the JPS Health Network Human Resources Department ("JPS HR") regarding a complaint of racist behavior made against her.  The complaint to JPS HR stated that Plaintiff was "overheard" making racist comments during the Zoom meeting on December 8.  Plaintiff had a telephone conversation with Ms. Morgan on December 30 and explained the circumstances and what was said during the Zoom meeting was the exact opposite of racism – she was advising the practitioner to beware of others who might be racist, themselves.

5.21    On or about January 10, 2022, Plaintiff was contacted via email by Ms. Morgan and asked for a written statement regarding the December 8, 2021 meeting.  Plaintiff provided the statement, dated January 12, 2022, and received an email confirmation from Ms. Morgan on or about January 14, 2022 indicating that the statement had been received.

5.22    Nothing transpired with the complaint or otherwise for two months.  Plaintiff continued in her regular job duties and responsibilities, both clinically and academically.

5.23    On March 18, 2022 at approximately 10:10 a.m., Plaintiff received a text message communication from Dr. Podawiltz and was called to a meeting where she was summarily removed by Dr. Podawiltz from her role as the JPS Health Network Psychiatry Residency Program Director, a position which she had held since January 2017.  During the meeting, she was also removed from her position as Psychiatry Department Vice Chair of Education, which is a high-level leadership position within the Department.  Individuals present in the meeting were Plaintiff,

Dr. Podawiltz (Chairman of the JPS Psychiatry Department), Brian Becker, M.D. (President of Acclaim Physician Group), and Dena Palmer (Psychiatry Department Executive).

5.24    During the March 18, 2022 meeting, Dr. Podawiltz (Plaintiff's direct supervisor) told her the reasons for her demotion were "hostile work environment" and "you no longer represent the values of Acclaim" (the JPS-Affiliated Physician Practice Group).  When Plaintiff pressed Dr. Podawiltz on the reason for her demotion, he finally stated "it's my prerogative as Chairman."  Dr. Podawiltz stated that he would provide to Plaintiff specific instances of the conduct giving rise to the demotion "next week."

5.25    The statement of "hostile work environment," as the Court knows, is a legal term of art with a specific meaning.  No such allegation was ever made against Plaintiff, much less the severe and pervasive conduct that is required for such a legal classification.

5.26    As to the comment on "not representing the values of the physician group," Plaintiff was confused, given that she was not terminated for such an alleged infraction.  Nor was Plaintiff formally removed from non-departmental leadership positions, including Chair of the JPS Health Network Practitioner Advisory Council (responsible for evaluation and management of disruptive physician behavior), Co-Chair of the Acclaim Physician Group Compliance Committee (responsible for development and administration of the Code of Conduct for the Acclaim Physician Group), JPS's Chair of the Graduate Medical Education Subcommittee on Diversity, Equity and Inclusion, and service on the JPS Health Network Ethics Committee.

5.27    Thus, the only apparent reason for the demotion was Dr. Podawiltz's apparent decision because it was solely within his "prerogative."  Dr. Podawiltz never provided the promised information as he stated would, the week following demotion.

5.28    All of this was under the critical fact that there was no formal disciplinary action taken against Plaintiff – no notice of charges, no proposed discipline notice, and no hearing.  No formal action had been taken relating to the December 2021 complaint, nor any other incident.  In fact, no due process occurred whatsoever despite JSP HR processes and procedures being in place, as well as processes and procedures for the JPS Medical Staff, which expressly required due process.

5.29    Plaintiff was told to take the rest of the day off if she needed to, but Plaintiff elected to return to the inpatient psychiatry unit to complete her direct patient care responsibilities because she had an obligation to her patients.  Patients in crisis need that help and, as always for Plaintiff, the patients come first.

5.30    The demotion was held one hour prior to "Match Day" results being released – arguably the Psychiatry Residency Program's most important annual event.  It is the culmination of each year's work cycle and effort for the Residency Program Director.  It also follows Plaintiff vouching for the credibility of the Psychiatry Residency Program, JPS, and its leadership structure with prospective students seeking the next, critical step in their career path.  Plaintiff never made these representations lightly, given their significance to the students, JPS and the patient community.

5.31    On March 18, 2022 at 10:35 a.m., Plaintiff texted Dr. Tricia Elliot to ask if she had time for a phone conversation. Dr. Tricia Elliot is the JPS Senior Vice President for Academic and Research Affairs and the Chief Academic Officer – Plaintiff's only other direct supervisor at the JPS Health Network besides Dr. Podawiltz.  At the time of the demotion, Dr. Elliott was responsible for supervising all departmental Residency Program Directors.  Dr. Elliot responded she was about to get on an airplane and asked if she could call Plaintiff when she landed.

5.32    On March 18, 2022 at approximately 11:00 a.m., less than an hour after the meeting, Dr. Podawiltz published a department-wide email informing all recipients of Plaintiff's demotion and of the promotion of Dustin DeMoss, M.D. to the position of Psychiatry Residency Program Director and Psychiatry Department Vice Chair of Education.  These were permanent and not "temporary" or "interim" appointments.

5.33    An hour later, at Psychiatry Department Grand Rounds, Dr. Podawiltz informed all attendees at the weekly meeting of Plaintiff's demotion and Dr. DeMoss's promotion. This was during a Zoom broadcast which was likely being attended by multiple persons outside of the JPS Psychiatry Department, as it was generally available to anyone in the JPS system.

5.34    The manner and speed in which the meeting and announcement of Plaintiff's demotion were carried out, specifically on "Match Day" one hour prior to the national matching results being released, show a premeditated intent to discredit and defame Plaintiff and her reputation as well as inflict mental anguish

5.35    Dr. Podawiltz has and continues to go unchecked and uncontrolled in his behaviors and decisions at JPS.

5.36    On March 18, 2022 at approximately 2:00 p.m., Dr. Podawiltz held a meeting with all of the residents in the psychiatry program who were available. He informed them of Plaintiff's demotion and Dr. DeMoss' promotion to the position of Psychiatry Residency Program Director. It has been reported by multiple residents that several residents directly and repeatedly questioned Dr. Podawiltz as to the reason for Plaintiff's demotion. He evaded the question repeatedly, at one point may have stated "we're taking the program in a different direction," and finally told them "I can't tell you why."  Other statements were made and ultimately, Dr. Podawiltz stated there were very solid grounds for the demotion, but that he would not share specifics – thereby imputing some

type of culpability and misconduct by the Plaintiff, which led to the decision. Others at JPS told residents that Plaintiff was a "narcissist" and "toxic" – labels and terms that have professional and diagnostic meaning, particularly in the field of psychiatry. All of these statements, individually and collectively, were unquestionably stigmatizing, personally and professionally; nor were or are the statements factually true or clinically accurate.

5.37    Numerous residents were upset. Since that time, at least one resident, and possibly more, have written statements to Dr. Elliot questioning and protesting Plaintiff's demotion.

5.38    On March 18, 2022 at 4:08 p.m., Dr. Elliot texted Plaintiff asking if she was available for the phone conversation. Plaintiff then had a telephone conversation with Dr. Elliot. Plaintiff asked Dr. Elliot about recourse and the process to appeal her demotion. Dr. Elliot told Plaintiff there was no appeal process and that the decision was strictly at the discretion of the department chairman (Dr. Podawiltz). This statement was in direct contradiction to similar proceedings, which have occurred during Plaintiff's time at JPS with regards to other Program Director positions.

5.39    On March 20, 2022 (Sunday) at 1:32 p.m., Plaintiff received a text from Dr. Podawiltz asking if she was going to take PTO (time off) tomorrow (Monday). Plaintiff simply responded "no." Plaintiff was scheduled to attend to patients on the Psychiatry Inpatient Unit and did carry out her clinical responsibilities on Monday and every day she has been scheduled to do so since then.

5.40    Plaintiff then sought legal counsel and retained Ms. Karin Zaner, a local North Texas lawyer

5.41    On March 21, 2022, Ms. Karin Zaner sent an email requesting an immediate phone conversation with the Chief Legal Counsel for JPS Health Network (Ms. Daphne Walker).

Ms. Zaner resent the email several times over the next few days because of the urgency and the fact that she got no response from Ms. Walker. On March 24, 2022, Ms. Zaner finally received a response from Ms. Michelle Humphreys (JPS Legal Department Administrative Assistant) that she would make sure Ms. Walker received and responded to Ms. Zaner's request for a phone conference.  Later that day, Ms. Humphreys gave Ms. Zaner a phone conference appointment of March 29, 2022, which Ms. Zaner accepted.

5.42    On or about March 28, 2022, Dr. Elliot held a vote at the Graduate Medical Education Committee meeting to officially install Dr. DeMoss as the Psychiatry Residency Program Director, just ten days after Plaintiff was demoted and removed without due process. Again, this process of installing a Program Director is usually carried out much more procedurally: an interim Program Director is named, a national search is typically carried out, and then a vote on the official designation of a Program Director.  None of that occurred.

5.43    On March 29, 2022, eight days after the request for a phone conversation and after the vote, JPS's legal counsel, Ms. Daphne Walker finally undertook a phone conversation with Ms. Zaner.

5.44    Following that call, on April 2, 2022, Ms. Zaner sent an email to Ms. Walker asking for specifics, including why Plaintiff was removed from her position, what the appeal process was, and the effect of the demotion on Plaintiff's pay.

5.45    At the same time, Plaintiff was asked to sign an amendment to her employment agreement officially removing her from the Program Director and Vice Chair of Education positions.  The fact that JPS demanded  a contractual amendment, itself, speaks to the property and liberty interests at stake. Plaintiff refused, pending resolution of these issues and a formal process that has never occurred.

5.46    On April 5, 2022, Ms. Zaner requested confirmation from Ms. Humphreys (JPS Legal Department Administrative Assistant) as to whether or not her April 2, 2022 email was received and when to expect a response from Ms. Walker. No response was received.

5.47    On April 7, 2022, Ms. Zaner sent another follow up email to Ms. Walker and Ms. Humphreys, as there still had been no response confirming receipt of the April 2, 2022 email or providing the requested information.

5.48    On April 8, 2022 at 11:41 a.m., six days after the email request for clarification and further information, Ms. Walker responded via email to Ms. Zaner stating, "I had to deal with other urgent matters and then was out of the office yesterday" and that she was working on the response.

5.49    On April 8, 2022 at 1:39 p.m., Ms. Walker responded via email that she had "reviewed the materials that she was provided from the Acclaim team." She also stated that she had asked for clarification from Acclaim on a couple of issues before she could respond to Ms. Zaner's request for information. Ms. Walker stated she hoped to have that information by Monday (April 11, 2022) and asked if Ms. Zaner was available for a phone conversation on Tuesday (April 12, 2022).

5.50    On April 12, 2022, Ms. Zaner had a phone conversation with Ms. Walker. Virtually no substantive information on the rationale for adverse employment action was conveyed.

5.51    On April 15, 2022, Ms. Zaner sent an email reiterating the points which were verbally discussed with Ms. Walker on April 12, 2022. She also requested written confirmation of the information provided by Ms. Walker. Ms. Walker was given a deadline of 5:00 p.m. on April 19, 2022 by which to respond. The points covered in this email, as stated by Ms. Walker during the phone conversation with Ms. Zaner on April 12, 2022 are:

      a.      Plaintiff was, in fact, demoted.

b.     A purported basis for the demotion was "several/numerous" resident complaints made against Plaintiff.  (Although this was never discussed at the March 18, 2022 demotion meeting).

c.     No substance of the complaints was provided during the phone conversation.

d.     Ms. Walker refused to send copies of the complaints for Plaintiff to review.

e.     Another purported basis for the demotion was an "HR complaint" against Plaintiff.

f.     No specific process and no avenue for appeal of the demotion would be available to Plaintiff.

g.     Confirmation that Plaintiff's pay would not be decreased.

5.52    Prior to the filing of this suit, despite numerous requests, no response to Ms. Zaner's April 15, 2022 email had been received from JPS.  No confirmation has been provided by JPS. No process has been set forth for Plaintiff to appeal or have any due process related to the adverse employment action.  In fact, the only information provided by Defendants is that it has no intention of providing any due process, having demoted Plaintiff, filled her positions, and stigmatized her in the process.

## VI.    COUNT ONE: VIOLATION OF 42 U.S.C. §1983 (INCLUDING CONSPIRACY)

6.1    Plaintiff incorporates the preceding allegations of the Complaint as if set forth herein, ***verbatim***.

6.2    At all times relevant to this case, the Defendants maintained both formal and informal policies and practices relating to due process afforded to all of its public employees, in terms of job status, alteration, demotion, termination, or other modification.  This includes procedural due process prior to any adverse employment action being taken against such

employees.  Such due process of law was guaranteed by the Constitution of the United States to protect the liberty and property interests of such employees, including Plaintiff.  Defendant Acclaim participated in direct delegation of duties as an agent of Defendant Tarrant County Hospital District and/or conspired with Defendant Tarrant County Hospital District to violate Plaintiff's civil rights. The Defendants acted consciously, maliciously and with callous indifference to the rights of Plaintiff by denying her such due process prior to taking adverse action relating to her public employment.

6.3     At all times relevant to this case, the Defendants had both a formal and informal custom, policy habit, or practice of permitting the publication of false and scurrilous charges in connection with the adverse employment action of a public employee, including Plaintiff, without affording that employee due process of law as guaranteed by the Constitution of the United States and without affording such a public employee a meaningful opportunity or hearing to protect her liberty and property interests in her continued reputation and good name within the community. Defendant Acclaim participated in delegation of duties as an agent of Defendant Tarrant County Hospital District and/or conspired with Defendant Tarrant County Hospital District to violate Plaintiff's civil rights.   The Defendants acted consciously, maliciously and with callous indifference to the rights of Plaintiff by imposing a lifelong stigma upon her reputation, in addition to the damage caused by the deprivation of her reputation and public employment.

6.4     Defendant Acclaim Physician Group, Inc. aided and abetted such violations by Defendant Tarrant County Hospital District by combining with Defendant Tarrant Hospital District, who was a state actor.  Likewise, Defendants conspired with one another while Defendant Tarrant County Hospital District operated as a state actor.

6.5    The Defendants have ratified the procedures and substance of the action taken by Dr. Podawiltz and Dr. Elliott regarding Plaintiff's adverse employment action and stigmatizing conduct.

6.6    Such conduct by the Defendants directly and proximately caused and resulted in substantial personal and economic damage to Plaintiff, as will hereinafter be alleged with particularity.

6.7    Plaintiff alleges the conduct of the Defendants constitutes a violation of 42 U.S.C. §1983 in that the Defendants, acting under color of state law as a governmental subdivision, willfully and intentionally violated Plaintiff's civil rights as guaranteed by the Constitution of the United States by denying Plaintiff due process of law as to her professional position and by stigmatizing her reputation, for which this suit now seeks redress.

### VII.    APPLICATION AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND ADVANCED TRIAL ON THE MERITS

7.1    Plaintiff incorporates the preceding allegations of the Complaint as if set forth herein, ***verbatim***.

7.2    Plaintiff applies and moves this Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure:  (1) to set a preliminary injunction in this matter at the earliest possible time and (2) advance the trial on the merits to the preliminary injunction stage under Fed. R. Civ. P. 65(b). Plaintiff moves for a permanent injunction following trial on the merits.  Plaintiff seeks a preliminary and permanent injunction against Defendants on the following matters:

(a)    to require Defendants to provide the proper due process afforded employees subject to adverse employment action, including notice of all charges, hearing and opportunity to respond to all charges, proper hearing and review/appeal.  This

includes adherence to JPS processes and procedures, as well as Fourteenth Amendment guarantees;

(b)    to require Defendants to provide a public name clearing hearing; and

(c)    to require Defendants to cease making disparaging or defamatory statements against Plaintiff.

7.3    Plaintiff is subject to imminent injury and irreparable harm by the actions of Defendants.  Her personal and professional reputation diminish by the day, and her ability to maintain or seek equivalent employment to that prior to the adverse employment action becomes less certain the longer the lack of due process is denied.

7.4    Defendants have engaged and continue to engage in the denial of due process concerning property and liberty interests, and stigmatizing activity that impacts her recognized liberty and property interests.

7.5.    The earlier the due process decisions raised here are resolved, the less damages may result and the proper status quo created.  Moreover, the uncertainty as to damages that arises from the lack of due process creates an urgency for injunctive relief.

7.6    Plaintiff is likely to prevail on the merits of this case. Plaintiff has demonstrated concrete, documented instances of past and ongoing due process violations.

7.7    The potential harm to the Defendants is minimal, as the injunctive relief sought merely places the party in the position it was intended to be, had due process been properly followed and adhered to by Defendants.  Further, the relief requested is beneficial to the public by ensuring proper administration of a public hospital and adherence to patient care.

7.8    Plaintiff is willing and able to post a reasonable bond and requests the amount be low due to the documented damages shown herein to Plaintiff and no likely damage to Defendants.

## VIII.   DAMAGES AND ATTORNEY'S FEES

8.1     Plaintiff incorporates the preceding allegations of the Complaint as if set forth herein, ***verbatim***.

8.2     Plaintiff would show that as a result of the conduct of the Defendants, she has been subjected to past and future intense personal humiliation, embarrassment, and mental anguish. Plaintiff would show the nature and extent of her mental anguish is severe and ongoing and it will continue indefinitely for the remainder of her natural life. For the recovery of such damage, Plaintiff here and now sues.

8.3     As a further direct and proximate cause of the violation of Plaintiff's constitutional rights, Plaintiff has suffered damage and harm to her reputation and professional career from which she has suffered a loss of earnings and a loss of earning capacity which will continue indefinitely, if not for the remainder of her natural life.  For such items of actual damage, Plaintiff here and now sues.

8.4     Plaintiff would show that as a result of the Defendants' conduct, she is effectively unemployable at her prior rank and responsibility in any similar public agency.

8.5     Plaintiff would show that as a result of the conduct of the Defendants as alleged herein, she has been required to obtain the services of the undersigned counsel and seeks the recovery of all attorney's fees incurred by her for the preparation, trial and appeal of this matter as permitted by 42 U.S.C. §1983 and 42 U.S.C. §1988.

## IX.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays:

1.     The Defendants be required to answer as provided by law;

2.     That Plaintiff obtain a preliminary and permanent injunction on the matters outlined above;

3.      That Plaintiff have and recover all actual damages to which she may show herself justly entitled;

4.      That Plaintiff have and recover her attorney's fees;

5.      That Plaintiff have and recover all costs of this action;

6.      That Plaintiff have and recover pre- and post-judgment interest as provided by law; and

7.      That Plaintiff have and recover all other relief, general or special, at law or in equity to which she may show herself justly entitled following trial.

Respectfully submitted,

**AYRES LAW OFFICE, P.C.**

By:    */s/ Christopher S. Ayres*
        **CHRISTOPHER S. AYRES**
        State Bar No. 24036167
        csayres@ayreslawoffice.com
        **R. JACK AYRES, JR.**
        State Bar No. 01473000
        rjayres@ayreslawoffice.com

        One Glen Lakes Tower
        8140 Walnut Hill Lane, Suite 830
        Dallas, Texas 75231
        (972) 991-2222 – Phone
        (972) 386-0091 – Fax

**ZANER LAW, P.C.**

        **KARIN M. ZANER**
        State Bar No. 00791183
        karin@zaner.law

        8117 Preston Road, Suite 300
        Dallas, Texas 75225
        (214) 363-5036 – Phone
        (214) 363-5046 – Fax

**ATTORNEYS FOR PLAINTIFF**